Catherine D. Sevcenko, *pro hac vice*
THE NATIONAL COUNCIL FOR INCARCERATED &
FORMERLY INCARCERATED WOMEN & GIRLS
300 New Jersey Ave NW, #300
Washington DC 20001
Telephone: (617) 299-2604, x703
Email: csevcenko@thecouncil.us

Katherine Ball
KATIE BALL, PLLC
P.O. Box 465
Eagle, Idaho 83616
Telephone: (208) 870-8072
Email: katieballpllc@gmail.com
Idaho State Bar No. 6666

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>BOE DANIELLE MOORE,<br><br>Defendant. | Case No. 1:22-cr-00086<br><br>**MEMORANDUM SUPPORTING MOTION FOR REDUCTION IN SENTENCE UNDER § 3582(c)(1)(A) ("COMPASSIONATE RELEASE")** |

## INTRODUCTION

For Boe Danielle Moore, the last year has been extraordinary, compelling and terrifying. She was the victim of sexual abuse, had her life ripped apart when FCI Dublin closed, and watched helplessly as her 14-year-old son sought refuge on the streets while her trans daughter spent a week in jail for pepper spraying her stalker. She therefore seeks compassionate release under 18 U.S.C §3582(c)(1)(A) on the basis of family circumstances, being a victim of sexual abuse, and being a survivor of FCI Dublin. Ms. Moore has made every effort to parent her children while incarcerated. She has also worked on self-improvement, taking classes to prepare herself for reentry into the community. The Warden at FCI Dublin approved her request for compassionate release because

she was sexually assaulted before the prison was closed. Acknowledging her serious transgressions, Ms. Moore humbly asks that this Court grant her compassionate release under any conditions it deems necessary so that she may take care of her children who are in crisis.

STATEMENT OF THE FACTS

**A.      Personal History**

Boe Danielle Moore, 40, has struggled for her entire life. Her parents were both drug addicts, so her grandmother received custody of her when she was five years old and raised her with the help of Ms. Moore's great uncles, one of whom started abusing Ms. Moore when she was a preteen. Dkt. 79 ¶ 60-1; Ex. A at 1, 3-4. He would force her to watch pornographic videos with him and molested her when she was about 12 years old. Ex. A at 5. The other uncle gave her methamphetamine when she was a young teenager, starting her down the path to addiction. *Id.* at 4; Dkt. 79 ¶ 62. Ms. Moore's grandmother's boyfriend would "wrestle" with her, touching her inappropriately. Ex. A at 4-5. When her grandmother did not take this seriously, "something inside [her] broke." *Id*. at 5. Ms. Moore lost her sense of security and began her life on the streets.

As a result of her childhood abuse, Ms. Moore self-medicated with illegal drugs starting at age 16. Dkt. 79 ¶ 62. She dropped in and out of school. *Id*. When she was 19, she managed to get her GED and an apprenticeship as a commercial painter. Dkt. 79 ¶ 73. When her three-year-old niece was murdered, she abandoned this path to sobriety. She was arrested for drug use while pregnant with her first child. Ex. A at 7-8. After four months of incarceration, she was released on probation. *Id*. at 8. Ms. Moore ended her relationship with the baby's father, who cut off all ties. She left her child with her grandmother and "ran the streets," continuing her cycle of trauma, addiction and sobriety. *Id*. at 7. In 2007, she violated probation by using drugs, but she did well in a court-approved program and was subsequently released on probation again. *Id*. at 9. In 2009, when she was pregnant with her son, "R.", she received another drug charge and gave birth while

2

in a drug-court sponsored program. *Id*. For a while Ms. Moore and her children were living in Section 8 housing and doing well but she relapsed again and was charged with distribution of methamphetamine. She did well in a work-community center and was released in 2014. *Id*. at 10. She worked and took care of her children until R.'s father reappeared in July 2015 and they both began using again. When she returned, her aunt told Probation that Ms. Moore could not live at her grandmother's house – her childhood home – and the rejection caused Ms. Moore to immediately relapse and begin using drugs again.

In September 2017 Ms. Moore was involved in a near-fatal car accident. Ex. A at 12. Her back was broken, her pelvis was shattered, all of her left-side ribs were broken, her spleen ruptured, and she had a severe hematoma. *Id*. To fix the damage caused by the crash, two pieces of hardware were placed in her sacrum. *Id*.; Dkt. 79 ¶ 67. Ms. Moore now has chronic pain and severe nerve damage to her entire left side. Ex. B at 1, 18, 34, 100, 116, 119, 124; Dkt. 79 ¶ 67. She recovered in prison and was there when her grandmother died in 2019, a few months before her release. Ex. A at 5.

In April 2022, Ms. Moore was indicted and pleaded guilty to one count of conspiracy to distribute methamphetamine. Dkts. 1, 69. She was sentenced to 110 months, which was subsequently reduced to 98. Dkts. 96, 124. Her projected release date is January 21, 2030.

**B.    Incarceration**

*a.    Ms. Moore's Sexual Assault*

Ms. Moore started serving her time at FCI Dublin in California. In November 2023, an incarcerated women sexually assaulted Ms. Moore. Ex. B at 8. Ms. Moore was picking the woman's dirty clothes off the floor when the other woman attacked her:

> As I was bent over, she grabbed me by the waist with one hand, and
> with the other she reached underneath and grabbed me by the
> vaginal area and pulled me back to rub up against her vaginal area.

Ms. Moore reported the incident immediately to a nearby staff member, but no one intervened for 30-40 minutes to separate the two women. Ex. A at 21; Ex.B at 8; Ex. C at 4. BOP staff did not file a PREA report until FCI Dublin's Psychiatrist intervened three days later. Despite Ms. Moore immediately reporting what happened, her complaint was not properly investigated. The Assistant Warden covered up the situation by calling her claim "inconclusive" because no video evidence existed. Ex. D at 1. Staff also failed to keep Ms. Moore separate from her assailant, triggering her post traumatic stress disorder (PTSD), and making her reluctant to leave her cell. Ex. C at 2-3, 5; Ex. A at 17. Ms. Moore also received minimal mental health care at FCI Dublin despite her childhood sexual abuse trauma. *Id*. at 4; Ex. A at 3-5.

> b.    *Closing of FCI Dublin*

FCI Dublin was "so notorious for the endemic sexual abuse of female inmates by prison staff that it [was] known as 'Rape Club.'"[1] Since 2021, when the AP published an in-depth exposé about FCI Dublin, at least eight employees have been charged with sexually abusing incarcerated women, including a Warden, Associate Warden, Chaplain, and several prison guards.[2] The

---

[1] Larry Altman, Congress Passes Prison Oversight Bill Prompted by Misconduct at FCI Dublin, The Independent (July 18, 2024), https://www.independentnews.com/news/dublin_news/congress-passes-prison-oversight-bill/article_cb2c3fd2-44d4-11ef-aeb5-03a128ca0eed.html; see also Olga R. Rodriguez, Inmates at California women's prison sue federal government over sexual abuse, The Associated Press (Aug. 16, 2024), https://apnews.com/article/california-prison-sexual-abuse-lawsuit-17d7ebd129844bee07e7287071b070ea.

[2] Michael Sisak, *et al*., *Bureau of Prisons to close California women's prison where inmates have been subjected to sex abuse*, Associated Press News (Apr. 15, 2024), https://apnews.com/article/federal-prison-dublin-california-sexual-abuse-bureau-of-prisons-17731ecb5d0a14adf6011e853bf7e05d.

investigation is ongoing. Of those charged, five have pleaded guilty and two were convicted at trial.

Although the BOP installed a new leadership team at FCI Dublin, the abuse did not stop. In August 2023, a coalition of advocacy groups filed a class action lawsuit against the BOP. *CCWP v. BOP,* No. 23-cv-04155, Dkt.1 (N.D. Cal. Aug. 16, 2023). The presiding judge, Yvonne Gonzalez Rogers, made an unannounced visit to FCI Dublin on February 14, 2024, spending nine hours at the prison speaking to over 100 AICs and staff. Judge Gonzalez Rogers concluded that the "BOP has lost the ability to manage with integrity and trust." Dkt. 222 at 7. In granting class certification, the court called the prison a "dysfunctional mess" and concluded that the BOP had "proceeded sluggishly with intentional disregard of the inmates' constitutional rights despite being fully apprised of the situation for years." *Id.* at 1.

The Court appointed a Special Master to oversee FCI Dublin, the first such appointment in BOP history. *CCWP,* No. 23-cv-04155 at Dkt. 248. Ten days later, the BOP announced it would completely shut down FCI Dublin and transfer the population to other prisons. Judge Gonzalez Rogers then ordered the BOP to update casework, classifications, and medical records before the women were transferred, with review by a Special Master. *Id.* at Dkt. 301. That did not happen. Instead, FCI Dublin staff were ordered to stay home while officers from other facilities expedited departures by throwing away personal property, limiting luggage allowances, withholding medication needed for the trip, skipping medical exams and other transfer requirements. Ex. D at 1-2. Ignoring court orders, the BOP moved the women incarcerated at FCI Dublin, including Ms. Moore, with no concern other than speed.

In response to Dublin's closure, Judge Gonzalez Rogers wrote an open letter to her colleagues confirming that the population at FCI Dublin "had limited to no access to

constitutionally adequate medical and mental health care, programming, and timely administrative relief … [and that BOP] proceeded sluggishly with intentional disregard" and repeatedly installed "BOP leadership who fail[ed] to grasp and address the situation." Dkt. 302-3. She concluded by asking her colleagues to consider compassionate release requests favorably because the women at FCI Dublin had done "hard time" beyond anything a sentencing judge could foresee or intend. *Id.*

> ### c.    Transfer

FCI Dublin was closed with brutality. Women were shipped out, sometimes in the middle of the night, with no idea where they were being sent. Ms. Moore traveled first to Nevada and then flew to Atlanta and was bussed to FDC Miami. Ex. D at 2. During all legs of the trip staff retaliated against the women they were transporting. Ms. Moore describes being denied bathroom breaks and access to hygiene products. *Id.* at 3. Newspaper reports support her declaration, noting instances where women soiled themselves or were forced to sit in menstrual blood.[3] She describes deliberate mistreatment such as turning up the air conditioning so the bus was freezing, or blasting rap music with explicit lyrics or a children's recording of "Wheels on the Bus" at full volume. Ex. D at 2. Staff told women that "this is what you wanted" and "that's what you get for opening your mouth," while calling them snitches and other names.[4] *Id.* at 3.

Ms. Moore was first sent to FDC Miami in Florida, a continent away from her family in Idaho. For five months she was confined in a high rise building in downtown Miami with no access to sunlight or the outdoors, except for a small, covered roof deck. Ex. D at 3. In the fall, she transferred to FCI Danbury, where she is currently.

---

[3] Lisa Fernandez and Cristina Rendon, *Powerless in Prison: the Shutdown of FCI Dublin*, FOX KTVU (May 5, 2024), https://www.ktvu.com/news/powerless-in-prison-the-shutdown-of-fci-dublin
[4] *Id.*

### d.    Family Circumstances

While Ms. Moore has been incarcerated, her two children aged 14 and 19 have been in the nominal care of Ms. Moore's elderly uncles[5] who have allowed the children to live in the family home. Ex. A at 13. One of the men is an addict and is disabled and the other is always absent – either at work or with his girlfriend. *Id.*; Ex. E. Ms. Moore reports that she signed over parental rights to the men so that they could get food stamps for the children, but her uncles still neglect to provide the children food. Ex. A at 13; Ex. F at 2-3. Ms. Moore's younger child, "R.", sometimes is forced to steal in order to have something to eat. R. has developed increasingly concerning behavior problems. In Fall 2023, R. ran away for five days, and the uncles neither looked for him nor reported him missing. Ex. A at 18.

Ms. Moore's other child, Amy, is transitioning from male to female. Ex. A at 13; Ex. F at 1. Although Amy is now 19, her uncle Robert was addicted to meth and physically abused Amy for years when she presented as a boy. Ex. F at 1. He used homophobic slurs and accused her of giving him AIDS. *Id.* at 2. Amy's aunt, who is no longer in contact with the family, used to abuse Amy, take her possessions, and one time poured chemicals on her genitals. Ex. F at 2. Amy's younger brother, R., was also abused. He now imitates his granduncle to mistreat his sister, including stealing her property worth over $1,000. *Id.* at 3. When the uncles found out about R.'s theft, they notified the police and R. was arrested. As a result, R. was put through the trauma of being jailed and Amy was put in the difficult situation of having to press charges against her own brother.[6] *Id.* That case is still pending.

---

[5] They are not the men who molested Ms. Moore and gave her drugs when she was a child.

[6] Counsel has been unable to obtain juvenile court documents.

Ms. Moore's family lives outside of Boise, Idaho, where trans people are not readily accepted.[7] Amy was stalked by a local man and ended up pepper spraying him in self-defense. She was arrested and kept in jail for nearly two weeks without receiving medical care for her injuries from the altercation with her stalker or her hormone therapy, which left her in severe pain. Ex. G; Ex. H. Amy pled guilty to a lesser charge and has since moved out of state, leaving her brother behind. Ms. Moore watched helplessly as all of this unfolded, as she remained incarcerated thousands of miles away from her children. She still can reach her children in ways that no one else can and thus is seeking compassionate release to get back to them before it is too late.

ARGUMENT

## I.   MS. MOORE HAS EXHAUSTED HER ADMINISTRATIVE REMEDIES

Ms. Moore first requested compassionate release because she had been sexually assaulted; the Warden at FCI Dublin approved that request on April 23, 2024 and sent it to the BOP Office of General Counsel ("OGC"), where it is still pending nearly a year later. Ex. C, I. OGC has not acknowledged requests for status updates made on March 7 and March 12. *Id.* This motion is nevertheless ready to be adjudicated. A defendant may move for compassionate release after "fully exhausted[ing] all administrative rights to appeal" the BOP's refusal to file a motion "or the lapse of 30 days" after the Warden receives such as "whichever is earlier[.]" 18 U.S.C. § 3582(c)(1)(A); *United States v. Keller*, 2 F.4th 1278, 1281 (9th Cir. 2021). Thus, Ms. Moore was able to file a motion as of May 16, 2024, 30 days after she requested compassionate release from the Warden at FCI Dublin. Ex. C. Second, under the BOP's own regulations, the OGC has 40 days to respond to an administrative appeal, a deadline that passed in early June 2024. 28 CFR 542.18. The First Step

---

[7] Ian Max Stevenson, Becca Savransky and Sarah A. Miller, *Laws target gender-nonconforming Idaho residents. Here's what they want you to know*, Idaho Statesman (Oct. 2, 2024). https://www.idahostatesman.com/news/politics-government/state-politics/article290844069.html#storylink=cpy.

Act removed the BOP as "gatekeeper over compassionate release petitions" to facilitate access to the courts. *United States v. Wright*, 46 F.4th 938, 945 (9th Cir. 2022). The BOP should not be allowed to undermine the statute's purpose by inaction. After waiting nearly a year for an answer, Ms. Moore is due her day in court.[8]

Deciding this motion now will also serve judicial efficiency. *Pennsylvania v. Ritchie*, 480 U.S. 39, 50 (1987) ("The interests of judicial economy and the avoidance of delay . . . would be best served by resolving the issue."). Even if approved, all the BOP can do is request that the US Attorney draft a motion, which it could decline to do. BOP PS 5050.50. In contrast, this motion has been filed, and the situation with Ms. Moore's children grows more dire every day. Waiting for the BOP Central Office to approve the recommendation and then pass it to the AUSA to draft a motion when one has already been filed makes no sense.[9] Exhaustion exists to give the BOP a chance to weigh in on a request for a reduction in sentence; it has had a year to do so.

On January 7, 2025, Ms. Moore amended her original request to add the incapacitation of her son's caregiver and her transfer from FCI Dublin as additional grounds for release. The Warden at FCI Danbury denied that request. Ex. J. She has exhausted her remedies on these two issues as well. *Keller*, 2 F.4th at 1281.

## II.    MS. MOORE'S SITUATION IS EXTRAORDINARY AND COMPELLING BECAUSE THE CARETAKERS FOR HER CHILDREN ARE INCAPACITATED, AND SHE SURVIVED ABUSE AT FCI DUBLIN AND AFTER IT WAS CLOSED

---

[8] The BOP is unlikely to take further action. From October 2019 to September 2022, 27,789 compassionate release motions were filed in federal court, 4,502 were granted, of which the BOP filed a mere 45, or 1%. Ciara N. Cooney, *Anything but Compassion: The Conflict Between Exhaustion and Compassionate Release*, 61 Am. Crim. L. Rev. 129, 144 (2024) (citing U.S. Sent'g Comm'n, *Compassionate Release Data Report: Fiscal Years 2020 To 2022* n.4 (2022), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/compassionate-release/20221219-Compassionate-Release.pdf.

[9] Counsel consulted with the U.S. Attorney's Office about the status of Ms. Moore's request before filing this motion.

Ms. Moore qualifies for compassionate release under three separate provisions of the U.S. Sentencing Guidelines. *First*, her 14-year-old son, R., has no adult supervision as his elderly great-uncles, one of whom is disabled, abuse and neglect him and are unable to control his behavior. §1B1.13(b)(3)(A). Earlier last fall he disappeared for five days and his uncles did not try to find him. They did not stop R. from abusing and stealing from his trans sister but then forced her to press charges so that R. would get arrested and not be their problem. Ex. A at 13, 18; Ex. E; Ex. F at 2-3. *Second*, Ms. Moore was sexually assaulted by another woman, and FCI Dublin covered it up, forcing her to agree that the incident was unsubstantiated in spite of medical and witness evidence to the contrary. §1B1.13(b)(4)(A). Ex. A at 21;  Ex. B at 8; Ex. C at 4; Ex. D at 1. *Third*, Ms. Moore was subjected to mistreatment, including denial of food and restroom access, during her transfer from FCI Dublin to FDC Miami which was of equal gravity to the other bases for compassionate release. §1B1.13(b)(5); Ex. D at 2-3.

### a.  Ms. Moore's Family Circumstances Are Extraordinary and Compelling

Ms. Moore has two children aged 14 and 19; her son, R., lacks any adult supervision and her daughter, Amy, has been driven away from home because of transphobia in her family and community.[10] Compassionate release may be granted if a minor child's caregiver dies or is incapacitated. Under the clear language of the Guidelines, Ms. Moore does not have to show that there are no other caregivers available, in contrast to the provisions related to incapacitated parents and other family members. *United States v. Taylor,* No. 4:11-CR-501-1, 2025 WL 19872, at *4 (N.D. Ohio Jan. 2, 2025). "Section 1B1.13(b)(3) is not ambiguous, and the drafters clearly knew how to write such a limiting requirement into a subsection." *Id. United States v. Cunningham*, No.

---

[10] Although Ms. Moore's daughter Amy is an adult, her son R. is under-age and thus Ms. Moore meets the requirement of this Guideline. Information is provided about Ms. Moore's daughter to underscore the urgency of the situation.

CR ELH-18-017, 2024 WL 4057004, at *8 (D. Md. Sept. 4, 2024). Although Ms. Moore does not

have to show that no other caretakers are available, there is in fact no other person available to

care for R. *See, e.g. United States v. Smith*, No. 2:21-CR-00279-CDS-EJY, 2024 WL 4556521, at

*4 (D. Nev. Oct. 22, 2024) ("Therefore, whether Smith is the only or best available caretaker for

Z is irrelevant to the present compassionate release inquiry.").[11]

      Ms. Moore's two uncles are unwilling or unable to care for R. Robert Moore says that he

is disabled and cannot supervise his grandnephew. Ex. E. Amy says that he is violent and addicted

to meth. Ex. F at 1-2. A caregiver who "is unable to adequately clothe, feed, or shelter" a child can

be considered incapacitated. *Smith*, 2024 WL 4556521, at *5 (mother living in a car with child).

Similarly, Robert Moore is unable to feed R. because he keeps the food stamps he collects on R's

behalf for himself, and he does not maintain the home. Ex. F at 2-3. At another point, Robert

allowed R. to live with another adult, Dave, who was "borderline abusive" and exposed R. to

drugs. *Id.* at 2.

      Robert also has a history of being abusive, which can make a caretaker "incapacitated" for

the purposes of compassionate release. *United States v. Fields*, 569 F. Supp. 3d 231, 242 (E.D. Pa.

2021) (granting release so that a father could seek custody of his daughter after her caregiver

allegedly abused her and she was put in foster care); *United States v. Taylor*, No. 4:11-CR-501-1,

2025 WL 19872, at *4 (N.D. Ohio Jan. 2, 2025) (government concession that a mother could be

considered "incapacitated" after movant's children were removed from her custody due to abuse).

Robert and his sister Dixie "berated" R. when he was younger and physically abused him. Ex. F

at 1.

---

[11] Nor does Ms. Moore have to prove that she is an "appropriate caregiver" although there is no
doubt that she is. *United States v. Gonzales*, No. CR 19-82-BLG-SPW, 2024 WL 3874838, at *2
(D. Mont. Aug. 20, 2024).

The other uncle, Johnny, has absented himself entirely: he works during the week and spends the weekends with his girlfriend. Ex. A at 13; Ex. E. Simply having a blood relative near the at-risk child does not preclude compassionate release. *United States v. Donato,* No. 03-CR-929, 2024 WL 665939, at *5 (E.D.N.Y. Feb. 16, 2024) (finding extraordinary and compelling circumstances when the only caretaker for movant's severely disabled son was his ex-wife, who had a full-time job and thus could not care for her son); *United States v. Kesoyan*, No. 2:15-CR-236-JAM, 2020 WL 2039028, at *4 (E.D. Cal. Apr. 28, 2020) (granting compassionate release to mother to care for disabled son because her adult son had to take care of his disabled father and grandmother with dementia, so he could not care for his brother as well). Johnny is also illiterate, making him unable to assist with schoolwork or administrative matters, as would be required for a competent guardian. Ex. A at 13.

Without adult supervision, both R. and Amy have become entangled in the criminal legal system. Amy was arrested for pepper spraying a man who was stalking her. She spent almost two weeks in the county lock-up, where she was denied access to her hormone medication, causing painful and disorienting side effects. Ex. G; Ex. H. Stopping hormone medication can cause endocrine withdrawal symptoms such as hot flashes, fatigue, anxiety, headaches, and muscle and joint pain.[12] Amy pleaded guilty to misdemeanor battery. Ex. G. Shortly after Amy's arrest, her brother R. disappeared for five days. Ex. A at 18. His uncles later turned him in for stealing his sister's possessions so they would not have to deal with him. Ex. F at 3. Ms. Moore thus respectfully requests compassionate release so that she can save her son from himself.

---

[12] Dr. Sarah Anderson and Dr. Ramon Martinez III. "Transgender Hormone Therapy." MOST Policy Initiative, May 3, 2023, https://mostpolicyinitiative.org/science-note/transgender-hormone-therapy/.

### b. Ms. Moore's Sexual Assault and the Subsequent Downplaying of her PREA Complaint Should Be Considered in Assessing Whether She Meets the Extraordinary and Compelling Circumstances Standard

Another woman sexually assaulted Ms. Moore on November 10, 2023 when they were locked up together in segregated housing. Sexual assault perpetrated by a BOP staff member or contractor is "extraordinary and compelling." §1B1.13(b)(4). Ms. Moore's trauma should not be ignored because of the identity of the perpetrator. Instead, the attack should be factored in under §1B1.13(b)(5), which states that anything that is "similar in gravity," to a specified ground may be considered.

Ms. Moore was put in a cell with another woman, who had left dirty clothes on the floor. As Ms. Moore was picking them up, the other woman attacked her:

> As I was bent over, she grabbed me by the waist with one hand, and with the other she reached underneath and grabbed me by the vaginal area and pulled me back to rub up against her vaginal area. Ex. B at 8.

A sexual act entails: "the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person. . . . ." 18 U.S. Code § 2246(2)(C). Had the assailant been a guard, Ms. Moore would meet the requirements of §1B1.13(b)(4). The same action by another inmate therefore is of similar gravity and is "extraordinary and compelling" under §1B1.13(b)(5).

The investigation into the attack was a sham. "[T]he unrefuted reality that FCI Dublin was a 'dysfunctional mess,'" lends credibility to claims of sexual assault absent "formal proceedings." *United States v. Russell,* No. 1:21-CR-00158-DCN-2, 2024 WL 4851154, at *6 (D. Idaho Nov. 21, 2024) (granting compassionate release based on mistreatment by a guard without official findings of wrong-doing). The former Assistant Warden for FCI Dublin testified that he adjudicated PREA complaints himself rather than forwarding them to the proper authorities for investigation.

13

*California Coalition for Women Prisoners v. United States,* 723 F.Supp.3d at 736-37 (N.D. Cal. 2024). He limited his investigation to looking at camera footage, and if there was no footage the complaint was dismissed as unsubstantiated, which is what happened to Ms. Moore. *Id.*

Sexual assault "is simply not part of a penalty that criminal offenders pay for their offenses against society." *CCWP,* 723 F.Supp.3d at 733 (quoting *Schwenk v. Hartford* 204 F.3d 1187, 1197 (9th Cir. 2000)). Ignoring sexual assault would "risk met[ing] out a disproportionate punishment." *United States v. Morales*, No. 2:16-CR-00241-KJM, 2024 WL 967658, at *5 (E.D. Cal. Mar. 6, 2024). The sexual assault against Ms. Moore is extraordinary and compelling under §1B1.13(b)(5).

### c. Ms. Moore's Experiences after FCI Dublin was Closed are Extraordinary and Compelling

The closure of FCI Dublin and displacement of the women incarcerated there was "extraordinary and compelling," providing another ground for granting Ms. Moore compassionate release. Never before has a United States Federal Judge intervened in the daily operations of a federal prison by appointing a special master. When the BOP hastily closed FCI Dublin rather than work with a Special Master, Judge Gonzalez-Rogers wrote that "BOP's operational plan for closure of FCI Dublin was ill-conceived and, like Swiss cheese, full of holes." *CCWP,* 23-cv-04155-YGR, Dkt. 300 at 1 (May 8, 2024). The Court criticized the "BOP [for] ignor[ing] [..] operational issues including the proper movement of AICs' property and the appropriate communication and messaging to the AICs and staff who were not advised of the closure until the last minute." *Id.* As a result, women incarcerated at FCI Dublin suffered unnecessary trauma from the mismanaged and retaliatory closing of the prison. *United States v. Castellanos*, No. 4:22-CR-00017-BMM-1, 2024 WL 4504523, at *3 (D. Mont. Oct. 16, 2024) (Morris, C.J.) ("FCI Dublin inflicted serious harm on inmates, which resulted in the historic closure of the facility."). *Russell,* No. 1:21-CR-00158-DCN-2, 2024 WL 4851154, at *2 (D. Idaho Nov. 21, 2024). Finally, a sitting

judge has never before felt compelled to ask her colleagues to consider the abysmal conditions at a prison when deciding a motion for compassionate release. *California Coal. For Women Prisoners v. United States*, Case No. 4:23-cv-04155-YGR, Dkt. 301-3) (copy of letter).

In her Declaration, Ms. Moore describes her ordeal after she left FCI Dublin. Ex. D. She describes being denied bathroom breaks, and access to hygiene products. *Id*. at 3. Newspaper reports support her declaration, noting instances where women soiled themselves or were forced to sit in menstrual blood. [13] *See Davis v. Gomez*, No. 20-CV-4683, 2023 WL 2572471, at *3 (N.D. Ill. Mar. 20, 2023 ("[D]eprivation of use of a bathroom that creates a risk of particular discomfort and humiliation' may rise to the level of cruel and unusual punishment."). She describes deliberate mistreatment such as turning up the air conditioning so the bus was freezing. Ex. D at 2. Accounts from other women confirm that this abuse was systematic. Staff warned that the women need[ed] to learn to keep your mouths shut" instead of complaining about sexual abuse.[14] While driving from the Atlanta airport, the bus driver played a children's recording of "Wheels on the Bus" and played rap music with explicit language about sexual acts at full volume for hours on end.[15] Ex. D at 2.

Ms. Moore's abrupt displacement from FCI Dublin and the mass retaliation and bullying she experienced during her transfer to FDC Miami constitute an "extraordinary and compelling

---

[13] The press widely reported on the frantic and unprecedented FCI Dublin closure, prompting congressional calls for an investigation because the BOP's "disregard for human dignity [could not] be tolerated." May 24, 2022 Letter Requesting an Investigation and Hearings on the Recent Closure and Transfer of Inmates from the Bureau of Prisons (BOP) facility Federal Correctional Institution (FCI) Dublin, 118th Congress, https://desaulnier.house.gov/sites/evo-subsites/desaulnier.house.gov/files/evo-media-document/FINAL%20LETTER%20-%20House%20Judiciary%20and%20Oversight%20on%20FCI%20Dublin.pdf.
[14] *Powerless in Prison*, at n.3, https://www.ktvu.com/news/powerless-in-prison-the-shutdown-of-fci-dublin.
[15] *Id*.

circumstance" under the catch-all provision that warrants her compassionate release. *United States v. Griffin,* 2024 WL 2891686, at *3 (E.D.N.Y. June 10, 2024) (granting compassionate release after movant was abused while serving time for a parole violation), *see also United States v. Santana*, No. 22 CR. 368 (VM), 2024 WL 2275037, at *2 (S.D.N.Y. May 20, 2024) (acknowledging that conditions of confinement are relevant in motions for compassionate release). *See Davis v. Gomez*, No. 20-CV-4683, 2023 WL 2572471, at *3 (N.D. Ill. Mar. 20, 2023 ("[D]eprivation of use of a bathroom that creates a risk of particular discomfort and humiliation' may rise to the level of cruel and unusual punishment.").

Judges have granted compassionate release under the "catch-all" provision for situations less compelling that being ripped from one's community, shipped across country without possessions, only to land up thousands of miles from family in an environment rife with retaliation. The provision is meant to "embrace[] a broad range of potential circumstances" and acts as a "mechanism to do justice" when warranted. *United States v. Evans*, No. 93-00123-CR, 2024 WL 5080545, at *12 (S.D. Fla. Dec. 10, 2024). For instance, it can be used to correct an unjust sentencing disparity between defendants, an inappropriately long sentence, or reflect a change in policy. *United States v. Brown*, 715 F. Supp. 3d 1034, 1046 (S.D. Ohio 2024); *United States v. Kindle*, 718 F. Supp. 3d 845, 848–49 (N.D. Ill. 2024) (granting compassionate release under (b)(5) because movant's incarceration was based on a stash house raid policy that had been disavowed).

The "catch all" standard also applies to the cumulations of concerning circumstances, even if standing alone they might fall short of the extraordinary and compelling standard. *United States v. Russell*, No. 1:21-CR-00158-DCN-2, 2024 WL 4851154, at *7 (D. Idaho Nov. 21, 2024). A long sentence based on old sentencing policy, poor health, and excellent rehabilitation can qualify under the catch-all section. *United States v. Patricia LeBaron*, 2023 WL 7308116, at *8 (S.D. Tex. Nov.

6, 2023); *United States v. Cirino*, No. 2:03-CR-176 JCM, 2024 WL 1636442, at *4 (D. Nev. Apr. 15, 2024). If inequities and harshness in individual circumstances can meet the "similar severity" test, then systematic cruelty inflicted on Ms. Moore and other women to retaliate for their complaints about widespread sexual abuse must also clear the bar.

Ms. Moore has presented "a combination of circumstances" that meets the definition of "extraordinary and compelling." The combination of her family situation, mistreatment during the FCI Dublin transfer, and the sexual abuse move Ms. Moore beyond the "threshold" of extraordinary and compelling. *United States v. Vaughn*, 62 F.4th 1071, 1073 (7th Cir. 2023); *United States v. Murdoch,* No. 1:22-CR-00148-DCN, 2024 WL 1374966, at *3 (D. Idaho Apr. 1, 2024) 2024 WL 1374966 (D. Idaho, 2024).

## III. THE PURPOSES OF SENTENCING HAVE BEEN MET UNDER SECTION 3553(a)

### a. Ms. Moore Meets all the Criteria for Early Release

Ms. Moore has struggled with drug abuse in the past but that does not determine the person she will be for the rest of her life. A sentence must be sufficient, but not greater than necessary, to serve the purposes of "just punishment, deterrence, protection of the public, and rehabilitation." *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017). These purposes of sentencing are considered "in light of the extraordinary and compelling reasons for reducing the term of imprisonment." *United States v. Greene*, 516 F. Supp. 3d 1, 27 (D.D.C. 2021) (Brown Jackson, J.). Here, the Warden of FCI Dublin approved Ms. Moore's request for compassionate release because she had been a victim of sexual assault who was ready to go home. Since then, her son has gotten out of control and she has been uprooted from FCI Dublin. These facts must color consideration of whether the purposes of sentencing have been met.

Because Ms. Moore has served "hard time," it is sufficient to release her after serving 30 percent of her sentence. *United States v. Smith*, No. 10-cr-0009-VAP at 2 (C.D. Cal. Feb. 12, 2024) (granting compassionate release to woman who had served 32 percent of her time); *United States v. Galaz*, 477 F. Supp. 3d 1134, 1142 (S.D. Cal. Aug. 7, 2020) (28 percent of a sentence); *United States v. Delgado*, 457 F. Supp. 3d 85, 87 (D. Conn. 2020) (29 months of a 120-month prison sentence for distributing cocaine). This District has recognized that "those serving at FCI Dublin during the recent scandal served 'harder time' than they might have otherwise." *United States v. Russell*, No. 1:21-CR-00158-DCN-2, 2024 WL 4851154, at *6 (D. Idaho Nov. 21, 2024). Furthermore, shortening a sentence that included sexual assault and institutional retaliation would not undermine its deterrent effect.

Ms. Moore has a history of relapse into drug use so this Court could understandably ask why this time is different. For the first time, Ms. Moore understands the pain her incarceration causes her children. Ex. K at 16-18. One supporter, Neil Essen writes: "I have known Boe Moore for years and for the first time she is ready for a drug and trouble free life." Ex. K at 2. Ms. Moore's release plan describes the numerous safeguards she will put into place to ensure her sobriety and accountability. Ex. L. In addition to seeking counseling, she has agreed to take a drug test any time her daughter asks and will allow her daughter to monitor her medication. *Id*. She will also stay off social media. *Id*. at 2. Ms. Moore came up with this plan herself. The level of detail shows that this time she is serious.

Ms. Moore's sentence must be tailored to the person she is today and cannot be tied solely to the gravity of the transgression. *Concepcion v. United States*, 142 S. Ct. 2389, 2400 (2022); *United States v. Tidwell*, 476 F. Supp. 3d 66, 77 (E.D. Pa. 2021) (stating the evaluation of a defendant's "history and characteristics is not frozen in time"). Evidence of rehabilitation is

"clearly relevant to the selection of an appropriate sentence" under 18 U.S.C. § 3553(a) to ensure the punishment is appropriate for the individual defendant before the court. *Pepper v. United States*, 562 U.S. 476, 488, 491 (2011); *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017). During her incarceration Ms. Moore has gotten sober and is finally able to be the mother that her children need.

Ms. Moore engaged in criminal activity due to a drug addiction and has worked to get clean and she will remain so. The Warden at FCI Dublin accepted her request for compassionate release, which would have included assessing her potential dangerousness. BP 5050.50. We can infer the Warden was comfortable with Ms. Moore returning to the community by the fact she recommended Ms. Moore's request be approved. Ex I at 1. *United States v. Siclovan*, No. 3:16-CR-00256-AN, 2024 WL 3406744, at *8 (D. Or. July 12, 2024) (granting compassionate release to former meth addict); *United States v. Gil*, 484 F. Supp. 3d 19, 24 (D.N.H. 2020) (recovered drug addict not a danger). Ms. Moore's disciplinary record is nearly perfect.

Ms. Moore has shown an ability to improve herself while being incarcerated by taking many courses including: Health and Wellness Throughout the Lifespan, Drug Abuse Education Course, CDL Test Preparation, Parenting 1 and 2. Ex. M at 1, 4-9. She completed these courses despite the sparse programming at FCI Dublin, showing her commitment to bettering herself and becoming a productive member of society. Her PATTERN score is low for violence and, based on her programming, her recidivism score should be lowered to low in April 2025. Ex. N.

**b.  Reentry Plan**

Ms. Moore will return to Idaho, where she will live with R. in the home provided by her uncles. She will have access to a car and has an offer to work at a local IHOP. In addition, she has

a CDL certificate, which will enable her to find more lucrative work as a truck driver once she has established trust with her probation officer and stabilized her home situation.

Ms. Moore is keenly aware of her history of relapse and is taking concrete steps to make sure this time is different. She will attend three Narcotics Anonymous / Alcoholics Anonymous (NA/AA) meetings per week and plans to arrange family therapy. Ex. L. This round of incarceration has forced her to face the harm her absence does to her children, which was easier to ignore when they were younger. Ex. A at 20. One of Ms. Moore's spiritual advisers, Reverend Brandt, wrote: "I am quite certain from our conversations that this transformation [rejection of drugs] is not contrived for an improved short-term earthly outcome, but it is a heartfelt conviction looking toward an unending future of joy and peace with God." Ex. K at 6. Reverend Brandt has promised to provide Ms. Moore with a strong support system upon her return home, and she has made arrangements with her daughter to intervene if she appears to be relapsing. Ex. L; Ex. K at 7. She invites this Court to add any conditions on her supervised release that it feels necessary to ensure her sobriety.

## CONCLUSION

Ms. Moore respectfully requests that this Court grant her compassionate release under whatever conditions this Court deems necessary. If this Court has any concerns about granting this motion, Ms. Moore requests a hearing so that all may be addressed.

DATED:  March 21, 2025.

By:    /s/_____
Catherine Sevcenko, *pro hac vice*
The National Council for Incarcerated &
Formerly Incarcerated Women & Girls

By:    /s/_____
Katherine Ball, Katie Ball PLLC

**CERTIFICATE OF SERVICE**

I certify that on March 21, 2025, I served a true and correct copy of the foregoing document upon the following by the method of delivery designated.

David Morse                                                      *Via CM/ECF*
United States Attorney's office
1290 West Myrtle Street, Suite 500
Boise, ID 83702
208-334-1211
David.Morse@usdoj.gov

BOE DANIELLE MOORE, Reg. No. 20635-510          *Via Mail*
FCI DANBURY
FED. CORRECTIONAL INSTITUTION
ROUTE 37
DANBURY, CT 06811

                                        By:    /s/ Katherine Ball
                                               Katherine Ball